## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DONNELL GREEN,

                **Plaintiff,**

v.

JOHN TROST, FE FUENTES, KIMBERLY
BUTLER, SUSAN KIRK,
ANTHONY WILLIAMS, ANGELA
WALTER, MISTY THOMPSON,
SHARON MCGLORN, TRAVIS JAMES,
MICHAEL MOLDENHAUER, and JOHN
BALDWIN,

                **Defendants.**

Case No. 3:17-CV-93-NJR-MAB

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Donnell Green, an inmate in the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging Defendants were deliberately indifferent to his serious medical needs by failing to properly diagnose and treat an ACL tear, medial meniscus tear, and lateral meniscus tear in his right knee while he was housed at Menard Correctional Center (Doc. 105). Following the Court's preliminary review of Green's Second Amended Complaint, Green is proceeding on one claim of deliberate indifference under the Eighth Amendment against all Defendants and one claim asserting IDOC Director John Baldwin violated the Americans with Disabilities Act and the Rehabilitation Act.

This case is before the Court on the Motion for Summary Judgment filed by Defendants Sharon McGlorn, Michael Moldenhauer, John Trost, M.D., Fe Fuentes, M.D., Travis James, and Susan Kirk ("the Wexford Defendants") (Doc. 152), the Motion for Summary Judgment filed by Defendants Kimberly Butler, Anthony Williams, Angela Walter,

Misty Thompson, and John Baldwin ("the IDOC Defendants") (Doc. 159), and the Motion to Strike filed by the Wexford Defendants (Doc. 162).

On July 19, 2019, Magistrate Judge Mark A. Beatty issued a Report and Recommendation that recommends the undersigned grant the IDOC Defendants' motion for summary judgment, grant in part and deny in part the Wexford Defendants' motion for summary judgment, and deny the Wexford Defendants' motion to strike (Doc. 173). The Wexford Defendants and Plaintiff Donnell Green filed timely objections to the Report and Recommendation (Docs. 174, 175). The Wexford Defendants and the IDOC Defendants both filed responses to Green's objection (Docs. 176, 177). For the reasons set forth below, the Court adopts in part and rejects in part the Report and Recommendation. The IDOC Defendants' motion is granted, and the Wexford Defendants' motion is granted in part and denied in part.

<h1 align="center">BACKGROUND</h1>

The following facts are undisputed for purposes of summary judgment. Green alleges that on January 19, 2015, he tore his meniscus while playing basketball (Doc. 153-2 at p. 8). Green saw Defendant Susan Kirk, a registered nurse at Menard, who gave him an ice pack and ibuprofen and referred him to a physician (*Id.*). Green testified he sued Kirk because he believed she did not treat him properly in that she did not order an MRI for him (*Id.* at p. 9). Although he was taken to the healthcare unit in a wheelchair, Green testified that after his visit he had to limp back to his cell house (*Id.* at p. 10).

Later that day, Green was seen by Defendant Dr. Fuentes, who noted that Green had injured his right knee while playing basketball and had no pain but slight numbness (Doc. 153-1 at p. 2). She further observed that he had a steady gait, and no swelling, redness, or tenderness (*Id.*). The record also stated: "Assessment: Rule out right knee vs ligament injury

(tear)." (*Id.*; Doc. 153-6 at p. 5). Dr. Fuentes ordered Green a 48-hour lay-in and an x-ray of his right knee and instructed him not to play sports for two weeks (*Id.*). The x-ray of Green's knee was taken the following day, January 20, 2015 (*Id.* at p. 11). The x-ray showed no fracture or significant arthritic change (*Id.* at p. 40).

On February 15, 2015, Green saw Defendant Thompson, a Certified Medical Technician, at the sick call line in the North II cell house (*Id.* at p. 32). Green reported pain and swelling in his knee and said that he could not bend it (*Id.* at p. 33). Thompson told Green that those types of things take a while to heal and that he would be in pain for a year (*Id.*). Green asked Thompson for an MRI, but she told him he would never get an MRI (*Id.*). After this visit, Green testified that he rested and would walk around but did not play sports or run (*Id.* at p. 34).

Green did not return to the healthcare unit with regard to his knee until June 19, 2015, when he again saw Defendant Kirk for complaints of knee pain (*Id.* at p. 3). At that visit, Kirk noted that Green injured himself playing basketball, had a popping pain on the inside of his right knee, had pain at a level 4 out of 10, and had been in pain for six months (*Id.*). Kirk further noted that Green showed signs of obvious discomfort when making quick movements and that lateral movements and lunges caused his knee to pop and swell (*Id.*). As a result, Kirk referred Green to a physician (*Id.*).

Green saw Defendant Dr. Trost on June 26, 2015 (*Id.* at p. 4). Dr. Trost prescribed naproxen for three months, ordered a right knee sleeve and another x-ray of Green's right knee, and instructed Green to return to the clinic in two weeks (*Id.*; Doc. 153-2 at p. 14). Green received his knee sleeve four days later (Doc. 153-1 at p. 46). On July 2, 2015, the second x-ray of Green's right knee showed that the joint space was preserved, articular margins were

intact, and there was no bony injury (*Id.* at p. 41).

Green was not seen in two weeks as directed by Dr. Trost. Instead, on August 1, 2015, Green saw Defendant Travis James, a licensed physician's assistant, for his routine five-year physical exam. James noted that Green's right knee buckles when he stops and pivots and he had pain upon palpation of the MCL (*Id.* at p. 5; Doc. 153-7). James placed Green on the doctor line to review his right knee pain (Doc. 152-1 at pp. 6, 35-37).

Green next saw Dr. Butalid, a non-party doctor, on August 27, 2017 (Doc. 153-1 at p. 6). Dr. Butalid noted that Green had a sprained right knee and prescribed him Motrin for two months (*Id.* at pp. 6, 35-37).

On September 13, 2015, Green saw a non-party Certified Medical Technician for a right knee injury he said he suffered two days prior while exercising (*Id.* at p. 7). Green reported his pain was at level 7 out of 10, but he had no range of motion restrictions and his anatomical alignment was within normal limits with no swelling or discoloration (*Id.* at p. 7). The CMT referred Green to a doctor (*Id.*).

On October 6, 2015, Green saw another non-party physician for a follow-up on his knee. This doctor noted that Green complained of his knee twisting, making it "buckle and tear." (*Id.* at p. 8). Green reported his knee felt better four and a half months after his injury, but he played basketball again "a few weeks ago," made another twisting motion, and then it hurt again (*Id.*). The doctor prescribed ibuprofen 600mg and educated Green on the need to stop playing basketball and jogging to avoid re-injuring his knee (*Id.*).

On February 9, 2016, Green saw a non-party nurse complaining of injuring his right knee the day prior while running "suicides" at the rec (*Id.* at p. 9). Green stated he had pain at a level 7 to 8 out of 10 (*Id.*). The nurse noted swelling above his right knee cap, that his leg

was in alignment, there was no discoloration, and Green was able to bear weight on his right leg. She noted, however, that he hears a click when he walks on it (*Id.*). The nurse gave him ibuprofen and a cold pack, and referred him to Nurse Practitioner Sharon McGlorn (*Id.*).

Defendant McGlorn saw Green on February 9, 2016 (*Id.* at p. 10). McGlorn noted his knee was swollen but had no cracking, popping, or warmth (*Id.*). He also had full range of motion and could bear weight (*Id.*). Green indicated his pain was at a level 10 (*Id.*). McGlorn reviewed his previous x-rays and noted he had fluid or soft tissue swelling (*Id.*) She ordered a third x-ray of Green's knee, educated him on lifestyle modifications, and told him to avoid striking exercises and exacerbating activities (*Id.*).

This third x-ray, taken on February 16, 2016, showed no fracture, dislocation, bony abnormality, or joint effusion (*Id.* at p. 42). Two days later, Dr. Trost referred Green to receive an MRI of his right knee (*Id.* at pp. 19-20). The referral was approved on February 26, 2016, and an MRI of the knee was taken on March 18, 2016—fourteen months after the January 2015 incident (*Id.* at pp. 38-39). The MRI showed an ACL and meniscus tears consistent with his January 2015 injury while playing basketball (*Id.*; Doc. 158 at p. 28).

On March 23, 2016, Dr. Trost referred Green for an orthopedic consultation, which was approved on April 6, 2016 (*Id.* at pp. 20-21). The orthopedic surgeon recommended Green undergo partial medial and lateral meniscectomies and ACL reconstruction surgeries (*Id.* at pp. 22-25). Dr. Trost referred Green for these surgeries, and on June 13, 2016, Green underwent arthroscopy, partial lateral meniscectomy, and open bone-tendon-bone anterior cruciate ligament reconstruction on his right knee (*Id.* at pp. 73-75).

Green returned to Menard that same day and was admitted to the infirmary (*Id.* at pp. 12-13). On June 21, 2016, Green saw the orthopedist for a post-operative follow up where

Green reported doing well (*Id.* at pp. 67-69). The orthopedist recommended Green begin physical therapy as soon as possible, "even if following a home exercise program," as well as that Green wear a knee immobilizer, use crutches, and avoid plant-pivoting motions of his right knee and sports (*Id.*). The orthopedist testified that the home exercise program at Menard was "not ideal," but that Green should still do the home exercise program rather than wait to be transferred to another correctional center (Doc. 166 at pp. 39-40). He acknowledged, however, that incarceration "absolutely" plays a factor in post-op treatment (*Id.* at p. 40).

On June 21, 2016, Green was referred for a physical therapy evaluation, which was approved on July 1, 2016 (*Id.* at pp. 28, 31). On July 22, 2016, Green had his physical therapy evaluation and was given a home exercise program (*Id.* at pp. 53-54). He began physical therapy on July 26, 2016 (*Id.* at p. 16).

In mid-July 2016, Green wrote a letter to Defendant Warden Butler and to the Healthcare Unit Administrator stating he wanted a transfer to another prison so that he could attend a legitimate physical therapy program—something that was not available at Menard (*Id.* at p. 24). As part of his home exercise program, Green was directed to do exercises twice a day, five days a week in a six-by-eight-foot room in the Healthcare Unit, under the supervision of correctional officers (*Id.*). The office did not have any equipment, and there was no certified physical therapist present (*Id.*). Green admitted, however, that the orthopedist had no problem with the home exercise program or the fact that there would be no physical therapist present (*Id.*).

On August 11, 2016, Green saw the orthopedist for his six-week follow-up appointment (*Id.* at pp. 70-72). The orthopedist recommended training and exercising to

strengthen the knee, but also said Green could return to general population to use the gym (*Id.* at pp. 33, 70-72). That same day, Dr. Trost discharged Green from the infirmary and allowed him to return to his cell house (*Id.* at p. 17). Green also was granted low bunk, low gallery, slow walk, and no stairs permits for three months (*Id.* at pp. 47, 64).

Green complained about the physical therapy situation at Menard to Defendant Williams, the Assistant Warden of Programs, both in letters and in person on September 5, 2016 (*Id.* at pp. 42-43). Green also complained that he was housed on 2 Gallery in the East cell house and could not go upstairs to take a shower because he had a restriction not to walk up stairs (*Id.* at p. 43). Green testified that Williams said he would look into the issue; however, Williams testified he does not recall any communications with Green in person or in writing (Doc. 160-3 at p. 5). Green also never put in for nurse sick call to explain to the medical staff he was having trouble getting up the stairs to the shower (Doc. 153-1 at p. 43). Green moved out of the East cell house on September 29, 2016, at which point he no longer had a problem taking showers (*Id.*).

On September 6, 2016, Dr. Trost referred Green for a three-month follow-up appointment regarding his ACL reconstruction (*Id.* at p. 55). Green's medical records indicate that this follow-up appointment was denied because he had missed physical therapy appointments and "showed poor effort in performing exercises." (*Id.* at p. 56). Green disputes this reasoning, however, and asserts that his physical therapy was impaired by pain and by having no access to a physical therapist (Doc. 153-2).

On September 8, 2016, Green was doing his home physical therapy program in the Healthcare Unit and requested ice from Defendant Walter, a nurse who was in the bullpen area watching inmates perform their exercises (*Id.* at p. 38). She did not give it to him, stating,

"your knee is supposed to hurt because you had surgery." (*Id.*). The following day, Green was performing his exercises when he tweaked something in his leg (Doc. 153-1 at p. 35). He told Walter that he had pain, but she just said, "oh well." (*Id.* at p. 35). There is evidence, however, that Walter documented Green's pain in his medical records and referred him to the doctor's call line (*Id.* at p. 36). Green testified that he sued Walter because she did not give him ice, could not assist him with his physical therapy exercises (as she was not a physical therapist), and did not express sufficient sympathy for his pain. He also claims her notes regarding his poor performance at physical therapy led to his third post-op, follow-up appointment with the surgeon to be canceled.

On December 5, 2016, Green saw Defendant Michael Moldenhauer, a nurse practitioner, to request renewal of his permits (*Id.* at p. 49). Moldenhauer noted a mild click in Green's left knee, good range of motion, and a steady gait (*Id.* at p. 49). He extended Green's low bunk, low gallery, knee sleeve, no stairs, and slow walk permits for two months and referred him to Dr. Trost (*Id.* at pp. 49, 65).

Dr. Trost saw Green on December 29, 2016 (*Id.* at p. 50). He referred Green for a follow-up appointment with the orthopedist regarding his ACL reconstruction, but the referral was not approved pending further discussion (*Id.* at pp. 59-60). Dr. Trost again referred Green for a follow-up on January 23, 2017, but the follow-up appointment again was not approved (*Id.* at pp. 61-63). On January 30, 2017, Dr. Trost granted Green low bunk and knee sleeve/brace permits for one year (*Id.* at p. 66). That same day, he filed this lawsuit (Doc. 1).

On February 1, 2019, the Wexford Defendants filed a motion for summary judgment arguing that Green could not, as a matter of law, make a submissible case that they were deliberately indifferent to his serious medical needs (Doc. 152).

On March 11, 2019, the IDOC Defendants filed a motion for summary judgment arguing: Defendants Butler and Williams did not have sufficient personal involvement in Green's medical care to be held liable for a violation of his constitutional rights; Defendants Butler, Williams, Thompson, and Walter were not deliberately indifferent to Green's medical needs; there was no violation of the ADA or RA when Green was not disabled for the purposes of those Acts (and even if he were, reasonable accommodations were provided) and Defendants were entitled to qualified immunity (Doc. 160).

Green filed a timely response in opposition to both motions (Docs. 158, 165).

### THE REPORT AND RECOMMENDATIONS

Judge Beatty entered a Report and Recommendation regarding Defendants' motions on July 19, 2019 (Doc. 173). As discussed below, Judge Beatty recommends the undersigned grant summary judgment to all Defendants except Dr. Fuentes and Dr. Trost.

**A.    The Wexford Defendants**

As to Defendant Kirk, Judge Beatty found that she is entitled to summary judgment because, even accepting as true Green's allegation that she forced him to limp 100 yards back to his cell house, Kirk examined him, gave him ibuprofen, and scheduled him to see Dr. Fuentes. Accordingly, no jury would find her deliberately indifferent to his serious medical needs.

Judge Beatty also found that James was entitled to summary judgment because, after examining Green on August 1, 2015, he placed Green on the doctor line for a review of his knee. Furthermore, as a physician's assistant, James had no authority to order an MRI or refer a patient to collegial review. Accordingly, there is no evidence James was deliberately indifferent.

With regard to McGlorn, Judge Beatty found that she reasonably relied on the x-rays previously ordered by the doctors and their prior treatment decisions in deciding to order a third x-ray on February 9, 2016. He further found that McGlorn's conduct in light of Green's injury did not rise to the level of deliberate indifference.

As to Defendant Moldenhauer's examination of Green on December 5, 2016—after Green's surgery—Judge Beatty found that Moldenhauer was not deliberately indifferent because he renewed Green's permits and reasonably relied on prior treatment decisions.

Judge Beatty did not recommend summary judgment, however, for Dr. Fuentes. Judge Beatty noted that despite Green's complaints of serious pain and her knowledge of a possible ligament tear, she ordered an x-ray rather than an MRI. He reasoned that while ordering a diagnostic technique is a matter of medical judgment, a doctor cannot ignore serious medical conditions by choosing one that is inadequate. It then took more than a year for Green to receive an MRI, a significant enough delay after characterizing the injury as a potential tear, that summary judgment is not warranted.

Likewise, Judge Beatty found that Dr. Trost is not entitled to summary judgment because he waited to refer Green for an MRI and instead ordered a second x-ray. Although he did not completely ignore Green's pain, his choice of the "easier and less efficacious treatment" may still amount to deliberate indifference in the eyes of a jury.

B.     **IDOC Defendants**

As to the IDOC Defendants, Judge Beatty first found that Butler and Williams were personally involved in Green's care, but they were still entitled to summary judgment because they were not deliberately indifferent. Although Green sent these Defendants letters about his lack of physical therapy, as an inmate he has no right to choose his own treatment.

Accordingly, he did not establish he had an objectively serious medical condition, and his claim must fail against Butler and Williams.

Judge Beatty also fund that Walter was not deliberately indifferent for refusing to get Green a bag of ice, noting that it is reasonable for an individual who just had surgery to experience a burning pain while performing physical therapy exercises. Thus, he did not establish an objectively serious medical condition. Furthermore, while Green complains that his third post-op appointment with the orthopedic surgeon was canceled due to Walter's notes regarding his lack of effort during physical therapy, that does not mean she was deliberately indifferent to any serious medical need.

As to Thompson, a medical technician, Judge Beatty found that her actions did not rise to deliberate indifference because Green did not demonstrate an objectively serious medical condition during his encounter with her. And, even if he had, one instance of failing to order an MRI or refer Green to a doctor is not deliberate indifference.

With regard to the ADA and RA claims, Judge Beatty found that Baldwin was entitled to summary judgment because Green's injury was a temporary, non-chronic condition that does not qualify as a disability under the ADA. Even if it did, Baldwin provided Green with permits for a low bunk, low gallery, slow walk, and no stairs. He also had constant access to medical professionals for treatment of his condition.

C.    **Motion to Strike**

In his response to the Wexford Defendants' motion for summary judgment, Green asks the Court to compel the Wexford Defendants to disclose Wexford's Orthopedic Surgery Policy and Guideline and then to grant him leave to supplement his response in opposition. The Wexford Defendants in turn request the Court strike Green's argument that Wexford

Defendants failed to provide Green with its Orthopedic Surgery Policy and Guideline and deny Green's motion for leave to file a supplemental response (Doc. 162). Judge Beatty recommends the Court deny the motion to strike and leave Green's response intact, but deny Green leave to supplement his response in opposition. No objection was filed to this portion of the Report and Recommendation.

## D.    Objections

The Wexford Defendants timely objected to Judge Beatty's conclusion that Dr. Fuentes and Dr. Trost are not entitled to summary judgment (Doc. 174). Green objected as well, arguing Judge Beatty improperly recommends summary judgment to all Defendants other than Dr. Fuentes and Dr. Trost. Both the Wexford Defendants and the IDOC Defendants filed responses to Green's objection (Docs. 176, 177).

LEGAL STANDARDS

When timely objections are filed, the Court must undertake *de novo* review of the Report and Recommendation. 28 U.S.C. § 636(b)(1)(B), (C); FED. R. CIV. P. 72(b); SDIL-LR 73.1(b); *Harper v. City of Chicago Heights*, 824 F. Supp. 786, 788 (N.D. Ill. 1993); *see also Govas v. Chalmers*, 965 F.2d 298, 301 (7th Cir. 1992). This requires the Court to look at all evidence contained in the record, give fresh consideration to those issues to which specific objections have made, and make a decision "based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Harper*, 824 F.Supp. at 788 (citing 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3076.8, at p. 55 (1st ed. 1973) (1992 Pocket Part)); *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). If only a "partial objection is made, the district judge reviews those unobjected portions for clear error." *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th

Cir. 1999). The Court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Summary judgment is proper only if the moving party can demonstrate "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). *See also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

## DISCUSSION

### I.   Deliberate Indifference Claims

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, a plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted).

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*,

428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). While deliberate indifference is not medical malpractice, a "delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)).

To establish deliberate indifference, a plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. "Even if a defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843).

### A. Dr. Fuentes

With regard to Dr. Fuentes, the Wexford Defendants object to Judge Beatty's conclusion that she is not entitled to summary judgment, arguing that Dr. Fuentes provided constitutionally adequate care. When she saw Green on January 19, 2015—the day he was first injured and only time she saw him—she ordered an x-ray to rule out any dislocation or fracture. In addition to the x-ray and the ibuprofen already ordered by the nurse, Dr. Fuentes gave Green a 48-hour lay-in permit and instructed him not to play sports for two weeks. She further testified that there are some ACL injuries that are minor enough to go unnoticed, and

that normal gait, lack of swelling, and lack of tenderness, are not consistent with a serious ACL injury requiring surgery. Accordingly, she did not think Green was suffering from a serious or complete ACL tear (Doc. 153-6 at p. 9).

Furthermore, because the x-ray came back negative for any dislocation or fracture, conservative treatment for a ligament tear or a sprain is analgesics and rest for six weeks (Doc. 153-6 at p. 7). And, Green did not return to the Healthcare Unit for treatment until June 19, 2015, five months after his initial injury. Based on these facts, Defendants argue, Dr. Fuentes's treatment of Green on January 19, 2015, did not rise to the level of deliberate indifference.

The Court agrees with Defendants. The record shows that Dr. Fuentes treated Green appropriately when she saw him on January 19, 2015, by ordering an x-ray, giving him a lay-in permit, and instructing him not to play sports. This is not a situation where Dr. Fuentes ignored Green's complaints or turned a blind eye to his plight. Nor is her decision to order an x-ray before a more invasive MRI "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 682 (7th Cir. 2008) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996); *see also Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'") (quoting *Estelle*, 429 U.S. at 107)). Instead, this is a situation where a doctor used her medical judgment to order a particular test, and decisions such as whether one course of treatment is preferable to another "are beyond the [Eighth] Amendment's purview." *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir.1996) ("What we have here is not deliberate

indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner.").

The Court acknowledges that when Dr. Fuentes received the x-ray results showing no fracture or dislocation, she probably should have investigated further or scheduled Green for a follow-up visit rather than relying on him to write a kite or go to sick call if he was still in pain. But her failure to do so, at most, amounts to negligence and does not rise to the level of deliberate indifference. *See Arnett v. Webster*, 658 F.3d 742, 758-59 (7th Cir. 2011). Accordingly, Dr. Fuentes is entitled to summary judgment.

**B.    Dr. Trost**

The Wexford Defendants next object to Judge Beatty's conclusion that Dr. Trost is not entitled to summary judgment. Dr. Trost testified that on June 26, 2015, he reviewed Dr. Fuentes's initial assessment and, because he had never met Green, decided to treat the injury as if it was a "fresh injury, so to speak." He also testified that he decided to do another x-ray so he could compare it with the previous x-ray to determine whether anything looked different. Dr. Trost prescribed naproxen, gave Green a knee sleeve, and instructed him to limit his activity.

While Judge Beatty concluded that Dr. Trost failed to refer Green for an MRI for more than a year after his injury, Defendants point out that Green self-reported another injury while playing basketball on October 6, 2015, and a third injury on February 9, 2016. Further, the orthopedic surgeon testified he could not determine when the full ACL tear actually occurred. Thus, they argue, Dr. Trost's decision to try conservative treatment before ordering an MRI does not rise to the level of deliberate indifference.

It is true, as discussed above, that an MRI is a diagnostic tool, and the decision of

which tool to use, if any, is a matter for medical judgment. "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment." *Id.*

"On the other hand, 'where evidence exists that the defendant knew better than to make the medical decision that he did,' then summary judgment is improper and the claim should be submitted to a jury." *Id.* at 662-63 (citing *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016), as amended (Aug. 25, 2016) (quotation marks omitted). A jury is entitled to weigh the defendant's explanation against certain information he knew, including documents he reviewed and evidence that the patient complained of enduring pain. *Petties*, 836 F.3d at 731.

Here, Dr. Trost testified that, although Green's injury occurred five months prior and he had a history of intermittent right knee pain, Dr. Trost wanted to "start fresh" because it was his first time examining Green (Doc. 153-5 at p. 13). He further stated that ordering an x-ray and instructing him to rest, take an anti-inflammatory medication, and wear a knee brace "was not going to hurt anything" given that Green was supposed to return in two weeks (*Id.*). When asked why he ordered another x-ray instead of an MRI at that point, Dr. Trost testified that six months had elapsed since the original x-ray,[1] and not all findings will show up on an initial film (*Id.* at p. 14). Six months later, however, something might appear on the x-ray from the initial injury (*Id.*).

---

[1] The Court notes that from January 19, 2015, to June 26, 2015, is actually a period of five months.

Green had a follow-up appointment with a physician's assistant six weeks later and reported that his knee still hurt. He was then seen by Dr. Butalid, a non-party doctor, who gave him Motrin and recommended exercises, a nurse who reported a new injury, another physician who gave him Advil, and Defendant McGlorn, who ordered a third x-ray. It was not until February 18, 2016, that Dr. Trost "was made aware of Mr. Green's situation" and requested approval for Green to receive an MRI (*Id.* at p. 20). Dr. Trost explained that, within the prison setting, there is no continuity of care with one provider for each patient, and that he was "unaware that this was going on." (*Id.*).

Based on these facts, a reasonable jury could conclude that Dr. Trost was deliberately indifferent when he failed to request an MRI on June 26, 2015, thereby prolonging Green's pain and delaying the treatment he actually needed for his knee. At the June 2015 visit, Dr. Trost was aware that Green saw Dr. Fuentes five months earlier for a knee injury related to playing basketball, that his prior x-ray was negative for any fractures or arthritic change, and that he reported intermittent pain since that time (*Id.* at p. 14). Although Dr. Trost claims he wanted to treat the injury as a "fresh injury," a jury could discount that testimony given that it was not, actually, a new injury. Finally, a jury could find Dr. Trost's failure to follow up on the results on the second x-ray or to ensure he saw Green in two weeks to constitute deliberate indifference, considering he testified that first taking conservative measures "was not going to hurt anything" when Green was supposed to be back in two weeks. In reality, Green was not seen by a medical professional for six weeks, and Dr. Trost did not see him again for another eight months.

Because the evidence here supports an inference that Dr. Trost "knew better than to make the medical decision that he did," Green's claim against Dr. Trost should be submitted

to a jury. Defendants' objection is overruled.

C.   **McGlorn, Moldenhauer, James, and Kirk**

Green objects to Judge Beatty's conclusion that summary judgment should be granted in favor of Wexford Defendants McGlorn, Moldenhauer, James, and Kirk, arguing that these Defendants were responsible for prolonging Green's pain and delaying an MRI. Green further claims that, had these Defendants followed Wexford's "Orthopedic Surgery Policy and Guideline," he would have received a referral to a specialist and an MRI as early as six weeks after his initial injury, and in no event longer than six months after his initial injury. Accordingly, Green argues, there are genuine issues of material fact with regard to Defendants' actions such that summary judgment must be denied.

In response, the Wexford Defendants argue that McGlorn, Moldenhauer, James, and Kirk had no authority to refer Green for an MRI, and the orthopedic surgeon testified that he could not determine with any degree of medical certainty when the full ACL tear actually occurred. Given that Green reported re-injuring his knee in October 2015 and February 2016, he cannot reasonably argue that these Defendants prolonged his pain until his surgery took place in June 2016.

With respect to these Defendants, the evidence shows that Kirk saw Green on January 19, 2015, when he first injured his knee. She gave him an ice pack and ibuprofen, and referred him to the doctor. Green testified he sued her for not ordering an MRI, but as a nurse, she had no authority to order any diagnostic testing. When he returned to the Healthcare Unit on June 19, 2015, Kirk noted he had a popping pain in his knee, pain at a level 4 out of 10, and showed signs of discomfort when making certain movements. She then referred him to a physician (*Id.*). This conduct does not even approach negligence, much less deliberate

indifference.

The same can be said for Moldenhauer, who treated Green *after* his surgery took place and *renewed* Green's permits for him, and James, a physician's assistant who saw Green at his routine physical, noted his knee issues, and placed him on the doctor line for further review. James testified he was a visiting PA stationed at Lawrence Correctional Center and he could not have ordered an MRI; however, he wanted to make sure Green saw a doctor after the physical (Doc. 153-7). None of this conduct rises to the level of deliberate indifference.

McGlorn's conduct also does not meet the standard for deliberate indifference. She first saw Green on February 9, 2016, after he complained of injuring his knee the prior day while running "suicides" at the rec. McGlorn reviewed his prior x-rays, noted that his knee was swollen, and ordered a third x-ray of his right knee. It is true that defendants cannot persist in a course of treatment known to be ineffective. *Greeno*, 414 F.3d at 655. But Green had just presented with a new injury to his knee, and McGlorn testified that she ordered the x-ray to discern whether the swelling was caused by fluid or soft tissue (Doc. 153-3 at p. 10). This evidence demonstrates that McGlorn exercised her professional judgment in deciding to order an x-ray, and federal courts will not interfere with a medical professional's decision to pursue a course of treatment where his or her judgment is exercised. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Finally, the Court notes that Wexford's "Orthopedic Surgery Policy and Guideline" handbook is not in the record. Accordingly, the Court will not consider that argument. Green's objection the Report and Recommendation as to Defendants McGlorn, Moldenhauer, James, and Kirk is overruled.

D.      **Defendants Butler and Williams**

Green further objects to Judge Beatty's conclusion that summary judgment should be entered in favor of Defendants Butler and Williams. Green argues that Judge Beatty incorrectly found that his disagreement with Menard's rehabilitation program is irrelevant because he is not competent to diagnose himself and has no right to choose treatment. Green points to the orthopedic surgeon's physical therapy recommendation and testimony that a home exercise program is not ideal, and argues Butler and Williams were deliberately indifferent when they ignored his letters complaining that he was not receiving the recommended physical therapy.[2] Furthermore, with regard to Williams, Green argues there is an issue of fact in that he denied receiving Green's letter, but there is a presumption on summary judgment that the letter was, in fact, received.

Even assuming for summary judgment purposes that Butler and Williams received Green's letters, there is no deliberate indifference here. "Inmates are not entitled to unqualified access to healthcare or the best care possible." *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1100 (N.D. Ill. 2018) (internal citations omitted). Nevertheless, a prison official can still be liable for deliberate indifference if he acts in a manner contrary to the recommendation of specialists. *Id.* This is not a situation, however, where Green was prescribed physical therapy by the specialist but prison officials refused to follow that recommendation. In fact, Green attended physical therapy twice a day, five days a week. It was just in the form of a home exercise program rather than with the assistance of a licensed physical therapist. The orthopedic surgeon indicated this situation was "not ideal," but acknowledged that Green's incarceration "absolutely" impacted his post-operation treatment options. And Green

---

[2] Green admits that Butler did, in fact, respond via the Healthcare Unit Administrator, but asserts the two-month delay in responding was effectively a non-response.

admitted that the surgeon never said he needed a physical therapist present or that the physical therapy offered by Menard was deficient (Doc. 153-2 at p. 25). Instead, he told Green "you got to get what you can get when you can get it" (*Id.*). Green got it; Defendants were not deliberately indifferent. Plaintiff's objection is overruled.

E.   **Walter**

Green next objects to Judge Beatty's recommendation regarding Walter, arguing that she would make negative and critical notes on Green's medical chart if she thought he finished therapy too quickly or complained of burning in his knee. This led to a denial of his third follow-up appointment with the orthopedic surgeon. She also refused to give him ice for his knee, intentionally causing him to suffer additional pain.

Refusing to give Green ice on one occasion does not constitute deliberate indifference. There is no evidence that the ice would have stopped Green's burning pain, and, again, inmates are not entitled to choose their own treatment. Additionally, noting that Green had a poor performance or refused to attend physical therapy on one or more occasions does constitute deliberate indifference or make her personally responsible for the decision not to allow him to visit the surgeon for his final follow-up appointment. Plaintiff's objection is overruled.

F.   **Thompson**

With regard to Thompson, Green objects because, although he was in severe pain and unable to bend his knee, Thompson gave him no treatment and told him these "type of things" take a while to heal. At most, Thompson's actions on this one occasion constitutes negligence and certainly does not rise to the level of deliberate indifference. Plaintiff's objection is overruled.

## II      ADA and RA Claims

Finally, Green objects to Judge Beatty's recommendation regarding his ADA and RA claims. Green argues that Judge Beatty ignored the fact that Director Baldwin failed to provide Green with appropriate physical therapy following his surgery despite the recommendation from the surgeon. He also asserts there are issues of fact with regard to whether Baldwin provided appropriate accommodations.

Title II of the ADA provides that "no qualified individual with a disability shall, because of that disability . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2006). "In the prison context, a plaintiff can make out a prima facie case of discrimination under both the ADA . . . by showing: (1) he is a qualified person; (2) with a disability; (3) the Department of Corrections denied him access to a program or activity because of his disability or otherwise subjected him to discrimination; and (4) the denial or discrimination was by reason of his disability." *Farris v. Kurr*, No. 16-CV-272-SMY-RJD, 2018 WL 3036130, at *3 (S.D. Ill. June 19, 2018) (citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)).

Failure to make reasonable accommodations to ensure participation in the public entity's programs or services by a person with a disability qualifies as "discrimination." 42 U.S.C. § 12112(b)(5)(A). Evaluating the reasonableness of a particular accommodation in the prison context is particularly fact-intensive and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff. *Golden v. Illinois Dep't of Corr.*, No. 12-CV-7743, 2016 WL 5373056, at *4 (N.D. Ill. Sept. 26, 2016) (citing *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001); *Holmes v. Godinez*, 311 F.R.D. 177, 226 (N.D. Ill. 2015)). "Security concerns, safety concerns, and administrative exigencies [are] important

considerations to take into account." *Id.* (citing *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996)). The key question is whether the inmate was able to participate in the activities in question, given his disability, with or without reasonable accommodations from the prison. *Love*, 103 F.3d at 560.

Here, the Court agrees with Judge Beatty that Green's ADA and RA claims fail. As noted above, the orthopedic surgeon testified that while the home exercise program was not ideal, the fact of Green's incarceration impacted the available treatment. The surgeon never stated that physical therapy with a therapist on site was required or that a home exercise program would not be effective. Moreover, the Court disagrees that allowing Green to perform physical therapy exercises in the Healthcare Unit twice a day, five days a week is "the equivalent of providing a band-aid as an accommodation for a severed limb." (Doc. 165 at p. 13). Green had a physical therapy appointment, was given an exercise program to do independently, and received medical permits to accommodate his needs post-surgery, including low-bunk, low-gallery, slow-walk, and no-stairs permits. Thus, the Court finds that no violation of the ADA or RA occurred.

## CONCLUSION

For these reasons, the Court **ADOPTS in part and REJECTS in part** the Report and Recommendation of Magistrate Judge Beatty (Doc. 173).

The Motion for Summary Judgment filed by the Wexford Defendants (Doc. 152) is **GRANTED in part and DENIED in part**. Defendants Sharon McGlorn, Michael Moldenhauer, Fe Fuentes, M.D., Travis James, and Susan Kirk are **DISMISSED with prejudice**.

The Motion for Summary Judgment filed by the IDOC Defendants (Doc. 159) is

**GRANTED**. Defendants John Baldwin, Kimberly Butler, Anthony Williams, Angela Walter, and Misty Thompson are **DISMISSED with prejudice**.

The Motion to Strike (Doc. 162) filed by the Wexford Defendants is **DENIED**, but Plaintiff Donnell Green's request to supplement the record is also **DENIED**.

This case shall now proceed solely on Green's claim of deliberate indifference against Dr. Trost. Judge Beatty is **DIRECTED** to set this matter for a settlement conference.

**IT IS SO ORDERED.**

**DATED:**   **September 23, 2019**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**